IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Angelita Lopez,                    )
            Plaintiff,              )
                        )
vs.                                )
                        )
                        )
Michael J. Astrue, Commissioner of the   )
Social Security Administration,    )       No. 2:09- cv -2655 - HRH
                        )
           Defendant.              )
                        )
                        )
                        )       **ORDER AND OPINION**

Procedural History

This is an action for judicial review of the denial of Supplemental Security Income and

disability insurance benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-434.

The parties' briefing on this matter is complete.[1]  Oral argument has not been requested and is

not deemed necessary.

Procedural Background

Plaintiff is Angelita Lopez. Defendant is Michael J. Astrue, the Commissioner of Social

Security. On May 31, 2006, Ms. Lopez filed an application for a period of disability and

disability insurance benefits and Supplemental Security Income benefits with an amended

---

[1]Docket Nos. 20, 23, 29.

alleged onset date of disability beginning August 1, 2005.[2] Plaintiff alleged that she was disabled because of obesity, depression, depressed intellectual functioning, and carpal tunnel syndrome.

Plaintiff's application was denied initially and upon reconsideration. After a hearing on May 14, 2008 the administrative law judge ("ALJ") denied plaintiff's claim.  On October 23, 2009, the Appeals Council denied plaintiffs' request for review, thereby making the ALJ's July 22, 2008 decision the final decision of the Commissioner.

On January 24, 2010 Ms. Lopez passed away. Her daughter, Destini Scadden, has substituted in as the party in interest.

General Factual Background

Appended to this order at Appendix A is the court's detailed summary of the medical evidence and records which are before the court for purposes of this appeal.

Hearing Testimony

A. Plaintiff

Plaintiff was born on December 4, 1964.[3] She was 43 years old at the time of the 2008 hearing.[4] She was 5' tall and at the time of the hearing weighed 300 pounds.[5] Plaintiff had

---

[2]Administrative Record ("Admin. Rec.") at 105, 108, 12-13.

[3]Admin. Rec. at 25.

[4]Admin. Rec. at 34.

[5]Admin. Rec. at 41.

a GED.[6]  Plaintiff's past relevant work includes customer service in a call center.[7]  At the time of the hearing, plaintiff was on Prozac.[8]

Plaintiff testified that she stopped working in March 2004 after having surgery, but alleged that he disability began on September 30, 2003, the date on which she ceased work due to persistent pain.[9]  After her surgery, fatigue, leg pain, and drowsiness as a side-effect from her medications prevented her from returning to work.[10]  In 2005, she was diagnosed with diabetes.[11]  In 1990 she had carpal tunnel release surgery performed on both wrists.[12]  She began seeing neurologist Dr. Wang in 2005 and receiving mental health care with Dr. Hilts in 2006.[13]  She was treated for arthritis of the knees by Dr. Hartfield, who gave her cortisone shots.[14]

Plaintiff testified that she cared for her son and parents, although they were all mostly self-sufficient.[15]  She made her bed, did light housework, shopped for groceries using a scooter, could not climb stairs due to pain in her legs, and occasionally used a walker.[16]  She spent between two

---

[6]Admin. Rec. at 35.

[7]Admin. Rec. at 25.

[8]Admin. Rec. at 46.

[9]Admin. Rec. at 35-38.

[10]Admin. Rec. at 41.

[11]*Id.*

[12]Admin. Rec. at 42.

[13]Admin. Rec. at 43.

[14]Admin. Rec. at 46-47.

[15]Admin. Rec. at 47-48.

[16]Admin. Rec. at 48-50.

to three hours each day on her feet, laid down for two or three hours per day, and would sit for three to four hours per day, but could not sit for more than twenty or thirty minutes at a time before her legs began to feel numb.[17] Plaintiff testified that she could carry a gallon of milk at most.[18]  She had no apparent social problems, as she testified that she had friends who would visit her.[19]  At the time of the hearing she weighed about 310 pounds, and could not maintain weight loss due to insulin and diet issues.[20]  Her doctor recommended gastric bypass surgery, but her insurance denied her claim.[21]

B.  Vocational Expert

David Janus testified as the vocational expert.[22]  The ALJ asked Janus to consider a hypothetical person of the same age and education as Lopez who could on occasion lift twenty pounds, regularly lift and carry up to ten pounds, stand and walk for at least two hours in an eight hour work day, sit for at least six hours per work day, only occasionally climb, balance, stoop, kneel, crawl, and crouch, never use ladders, ropes, or scaffolds, and who also needed to avoid concentrated exposure to cold, heat, vibration, and fumes and moderate hazards.[23] Such a person could perform Lopez's past relevant work.[24]  If that same individual could on occasion

---

[17]Admin. Rec. at 51.

[18]Admin. Rec. at 52.

[19]Admin. Rec. at 52-53.

[20]Admin. Rec. at 53-54.

[21]Admin. Rec. at 54.

[22]*Id.*

[23]Admin. Rec. at 55-56.

[24]*Id.*

lift only ten pounds, regularly lift and carry up to ten pounds, stand and walk for at least two hours in an eight hour work day, sit for at least six hours per work day, only occasionally climb, balance, stoop, kneel, crawl, and crouch, never use ladders, ropes, or scaffolds, and who also needed to avoid concentrated exposure to cold, heat, vibration, and fumes and moderate hazards, she could still perform Lopez's past relevant work.[25]  If that person needed to alternate between sitting and standing, they could still work; unless they needed to sustain twenty or thirty minutes of stretching or standing while changing position.[26]  If that person also had moderate limitations on the ability to remember, understand, and carry out detailed instructions and maintain attention and concentration for extended periods of time, she would not be able to perform Lopez's past relevant work.[27]  But this hypothetical person could perform other jobs that exist in the local and national economy, such as assembler or addresser, which are both sedentary, unskilled jobs.[28] Both of those jobs require frequent bimanual dexterity and are fast-paced, but could "most likely" be performed by an individual with moderate limitations on concentration, persistence and pace due to borderline intelligence and depression.[29]  If the described hypothetical person also suffered from severe pain which seriously affected ability to function, that person would probably be unable to perform any work.[30]  If that person needed to take medications for pain

---

[25]Admin. Rec. at 56.

[26]*Id.*

[27]Admin. Rec. at 57.

[28]*Id.*

[29]Admin. Rec. at 58.

[30]Admin. Rec. at 59.

and lie down rest during the day for thirty minute intervals, that person could work at Lopez's past relevant work; but could not work any jobs if those breaks were unscheduled.[31]  If the claimant's testimony regarding needing to lie down for two to three hours per day were true, such a person would be unable to work.[32]

The ALJ's Decision

The ALJ applied the five-step sequential analysis used to determine whether an individual is disabled.[33]  At Step One, the ALJ found that plaintiff had "not engaged in substantial gainful activity since September 30, 2003, the alleged onset date."[34]  At Step Two, the ALJ found that plaintiff had the following impairments: diabetes mellitus with neuropathy, obesity, and an affective disorder.[35]  Plaintiff had been receiving treatment for diabetes and neuropathy.[36]

The ALJ concluded that plaintiff's combination of impairments did not meet  one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, at Step Three.[37]  The ALJ found that plaintiff had mild restriction in activities of daily living, needing some help with dressing and bathing, but doing the normal activities of running a household.[38]  Plaintiff cared for a minor child, drove a vehicle, shopped, and attended appointments.  In social functioning, plaintiff was

---

[31]*Id.*

[32]Admin. Rec. at 60.

[33]Admin. Rec. at 17-19.

[34]Admin. Rec. at 19.

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]Admin. Rec. at 20.

found to have mild limitation.[39]  Plaintiff had reported living in a home with the father of her

children, regularly talked with friends and family on the phone, was sometimes visited by

friends, and testified to living with her parents at the time of the hearing.  Citing the plaintiff's

consultations with Dr. Huddleston and Dr. Young, plaintiff was found to have moderate

difficulties with concentration, persistence, and pace.[40]  Dr. Huddleston noted that plaintiff was

casually attired with good grooming and hygiene, alert and 4x oriented, with eurythmic mood

with a mild aspect of depression.  She affected full range and appropriate mood state, denied any

history of delusion, paranoid thoughts, perceptual or sensory disturbances.  She reported crying

over minor matters and helplessness against her health problems.  Her cognitive scores were

borderline, but Dr. Huddleston opined that plaintiff's range was likely low-average, and plaintiff

was opined to have a good prognosis for returning to work.  Her main limitation was moderate

limitation in the ability to understand, remember, and perform detailed instructions and maintain

attention and concentration for extended periods.  The ALJ also considered the more recent

psychological evaluation by Dr. Young, who noted good hygiene and informal attire, good eye

contact, alertness, clear and reasonably paced speech, logical, goal directed, and appropriate

thought process, and good attention.  Plaintiff's affect was appropriate, her mood was serious but

happy, and insight and judgment were fair.  Plaintiff scored 27 out of 30 on the Mini-Mental

Status exam, was oriented 3x, and had good immediate memory.  She had difficulty counting

serial sevens and recalling words after short delay.  Spelling, geometry, and three-step

instruction tests were completed, plaintiff reported feeling worthless, helpless, and hopeless, and

---

[39]*Id.*

[40]*Id.*

having difficulty concentrating.  Dr. Young completed a medical source statement and opined that plaintiff would have moderate difficulty in maintaining attention and concentration for extended periods and maintaining socially acceptable behavior and to adhere to basic standards of neatness and cleanliness.  There was no evidence of decompensation.[41] Plaintiff did not have a mental impairment or combination of impairments that caused at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, and thus did not meet paragraph B or C criteria.

Considering the entire record, the ALJ found that plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a); she could lift and carry up to ten pounds at any time, sit six hours and stand or walk two hours in an eight hour workday with alternation between sitting and standing for at least 30 minutes, occasionally climb, balance, stoop, kneel, crouch and crawl, but was unable to climb ladders, ropes, and scaffolds.[42]  Plaintiff was found to need to avoid concentrated exposure to cold, heat, vibration, and fumes, and avoid moderate exposure to hazards such as unprotected heights and moving machinery.[43]  Due to plaintiff's depressive disorder, she was found to be moderately limited in the ability to understand, remember and perform detailed instructions and maintain attention and concentration for extended periods.[44]

---

[41]Admin. Rec. at 21.

[42]*Id.*

[43]*Id.*

[44]*Id.*

In making this determination, the ALJ was required to assess plaintiff's credibility in her testimony.[45]  The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the RFC assessment.[46]  The ALJ found that the record did not show the plaintiff's diabetes, obesity, and fatigue to be disabling.  The ALJ noted plaintiff's thirty-five year history of smoking a pack and a half of cigarettes daily, not liking vegetables and eating only ramen noodles contrary to doctor recommendations.[47]  Despite uncontrolled morbid obesity and diabetes, the medical records did not indicate that plaintiff's diabetes required hospitalization or more drastic treatment beyond her monthly checkups and prescription refills. And despite plaintiff's testimony of minimal daily activity, the record, including plaintiff's reports to doctors, showed her to be more active. Additionally, clinical examinations, such as the October 2005 motor examination and the August 2006 physical evaluation, showed greater physical ability than plaintiff testified to, including plaintiff's 2006 statement to Dr. Huddleston that she usually woke at 5:00 a.m. and took care of her household chores and groomed well.[48]

The majority of the medical opinions indicated no disabling condition.[49]  An October 2005 motor examination revealed normal muscle tone without atrophy, rigidity, spasticity or

---

[45]Admin. Rec. at 21-23.

[46]Admin. Rec. at 22.

[47]Admin. Rec. at 23.

[48]*Id.*

[49]Admin. Rec. at 23-25.

fasciculation.  An August 2006 physical examination by Dr. McPhee noted that plaintiff was unstable when walking in tandem, could rise on her toes and heels but not walk on them, could not squat but could fully bend her lumbar spine, stand from a chair, remove and put on footwear, and get onto the table.  Her range of motion in elbows, shoulders, and wrists were normal, and although she had positive signs for carpal tunnel syndrome, there was no neurological weakness, with sensation intact.  Plaintiff had bilateral pain of the calves, but sensation was intact with no weakness.  A more recent opinion by Dr. Halloum in 2007 was also noted.

Diagnostic examinations of plaintiff also did not reveal a disabling impairment: an August 2005 electromyogram showed normal arms and mild spinal neuropathy; a December 2004 X-ray of plaintiff's spine showed mild scoliosis and minimal degenerative spur formation. Although weight loss was recommended, plaintiff reported that she did not exercise.  Ultrasounds and X-rays of plaintiff's right knee revealed no medically determinable diseases, defects, fractures, or dislocations.  Although plaintiff testified that side effects from her medications prevented her from working, she denied any side effects to Dr. Wang in October 2005.  None of the opinions from Drs. McPhee, Halloum, Huddleston, and Young indicated that plaintiff had a disabling condition; Dr. Wang recommended weight loss, and Dr. Hilts agreed that nothing was wrong with plaintiff (although Dr. Hilts also opined in April 2008 that plaintiff would have a severe work restriction).  The ALJ relied on the state agency medical opinions because they were consistent with the record as a whole.

The ALJ considered the plaintiff's daughter's third-party function report indicating that plaintiff needed assistance dressing, grooming, did not help around the house, needed to adjust legs hourly, and could pay attention and follow instructions depending on medication.

At Step Four, the ALJ found that plaintiff was unable to perform any of her past relevant work.[50]  The ALJ relied on the vocational expert's testimony to find that plaintiff's residual functional capacity prevented her from engaging in call center customer service.  Plaintiff was defined as a younger person at the time of the hearing, with a GED, and the Medical-Vocational guidelines directed a finding of "Not Disabled" whether or not job skills were transferable.  At Step Five, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, and thus she was not disabled.[51]  Relying on the vocational expert's testimony due to the existence of non-exertional impairments, the ALJ found that plaintiff could have successfully adjusted to work that existed in significant numbers in the national economy.[52]

Standard of Review

The Social Security Act provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability, and Supplemental Security Income to those who cannot work.[53] For purposes of the Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected...to last for a continuous period of not less than 12 months."[54] A person is not disabled if he or she is

---

[50]Admin. Rec. at 25.

[51]Admin. Rec. at 26.

[52]*Id.*

[53]42 U.S.C. § 423(a)(1).

[54]42 U.S.C. § 423(d)(1)(A).

capable of engaging "in any...kind of substantial gainful work which exists in the national economy."[55]

Upon denial of disability benefits after a hearing by an ALJ, a claimant may request that the SSA Appeals Council review the ALJ's decision.[56] "Where, as here, the Appeals Council denies a request for review of an ALJ's decision, the decision of the ALJ represents the final decision of the Commissioner."[57] After a final decision of the Commissioner, the claimant may seek judicial review by the district court.[58]

On de novo review, a district court may enter, upon the pleadings and a transcript of the record, a judgment affirming, modifying, or reversing the ALJ's decision, with or without remanding the case for a rehearing.[59] The district court must uphold the ALJ's decision if it is supported by substantial evidence and the ALJ has applied the correct legal standards.[60]

---

[55]42 U.S.C. § 423(d)(2).

[56]20 C.F.R. § 404.967.

[57]*Baston v. Commissioner of Social Sec. Admin.*, 359 F.3d 1190, 1193 n.1 (9th Cir. 2004) (citing 20 C.F.R. §404.981).

[58]42 U.S.C. §405(g).

[59]42 U.S.C. §405(g).

[60]*Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2001).  See also *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

<u>Discussion</u>

Plaintiff requests summary judgment by challenging the Commissioner's determination at Step Three in failing to evaluate obesity, and at Step Five, at which step the burden of proof lies on the Commissioner to show that other work exists in the national economy that plaintiff would be capable of performing.[61]  Plaintiff contends that: 1) the ALJ's Residual Functional Capacity assessment establishes that plaintiff is unable to work; 2) the ALJ failed to evaluate plaintiff's obesity at Step Three as required by Policy Ruling 02-1p and failing to discuss her combined impairments; and 3) the ALJ failed to properly weigh medical source opinion evidence, subjective complaints, and third party reports during the RFC assessment, leading to error at Step Five.  Plaintiff requests a remand for computation of benefits.

<u>1. Residual Functional Capacity Assessment and Plaintiff's Ability to Work</u>

As set out above, at Step Four of the analytic process, the ALJ found that plaintiff was unable to perform her past relevant work.  He went on to find, based upon the testimony of the vocational expert, that there was work in the local and national economy for a person having those limitations the ALJ found plaintiff to have: namely, an assembler position or an addresser, both of which positions are sedentary and appropriate for an unskilled person with the plaintiff's limitations.[62]

On appeal, plaintiff argues that when the vocational expert was asked if those limitations would preclude the performance of the jobs of assembler and addresser, the expert responded

---

[61]Docket No. 20.

[62]Admin. Rec. at 57.

that "most likely [plaintiff would] not ... be able to sustain the work."[63]  This latter colloquy took place between counsel and the vocational expert.  In making the foregoing argument, plaintiff has lost sight of the fact that counsel altered the hypothetical question which had been put to the vocational expert by the ALJ.  Specifically, the vocational expert was asked by counsel:

> Q:  If an individual was of that profile offered to you by the Administrative Law Judge but we added that there is moderate limitations in the ability to sustain concentration, persistence and pace due to borderline intelligence, would that have an effect on the ability to perform claimant's past work? [[64]]

After some clarification, counsel revised the question as follows:

> Q: I guess you said that there was no past work-
> A: I said there was no-
> Q:  - for the Judge's hypothetical so let me revise that and say if we were to add moderate limitations in the ability to sustain concentration, persistence and pace due to borderline intelligence and depression, would that prevent such an individual from performing those alternate jobs? [[65]]

It is in that context that the vocational expert in substance responded, "No."[66]

The ALJ did not find, and the record would not support, a finding of borderline intelligence.[67]

For the preceding reasons, plaintiff's first contention on appeal is without merit.

---

[63]Admin. Rec. at at 58-59.

[64]Admin. Rec. at 58.

[65]Admin. Rec. at 58 [emphasis supplied].

[66]Admin. Rec. at 59.

[67]*Gallant v. Heckler,* 753 F.2d 1450, 1452-53 (9th Cir. 1984).

2. ALJ's Step Three Analysis

Plaintiff argues that the ALJ's decision was legally deficient at Step Three of the evaluation process because it failed to consider plaintiff's obesity, and because it failed to discuss the effect of plaintiff's combined impairments.[68]

Plaintiff was between 5' and 5'3" and consistently weighed in excess of 300 pounds during the period at issue.  Plaintiff argues that, based on this evidence, the ALJ was obligated to consider the effect of obesity in relation to the musculoskeletal Listings 1.02 and 1.04, and the neurological and endocrine Listings 11.14 and 9.08, as well as the mental Listings 12.04 and 12.05.[69]

Obesity is *not* an impairment on the Listings at Step Three.[70]  In effect, plaintiff argued that the ALJ should have evaluated her obesity as *equivalent* to some Listing-level impairment, or as an impairment that, combined with another impairment, was equivalent to some Listing.  The ALJ is not required to discuss the combined effects of impairments or compare them to any listing in an equivalency determination *unless* the claimant presents evidence in an effort to establish equivalence.[71] Plaintiff argues that she presented evidence where the diagnosis and clinical findings of obesity suggested that the possibility for a listed impairment existed,

_____

[68]Policy Ruling 02-1p (rules for evaluating obesity); Listings 1.02, 1.04, 11.14, 9.08.

[69]C.F.R. § 404, Appx. 1, Subpt. P, Reg. No. 4.

[70]SSR 02-1p ("Obesity *may* be a factor in both "meets" and "equals" determinations. Because *there is no listing for obesity*, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing...[or] if there is an impairment that, in combination with obesity, meets the requirements of a listing." [emphasis added]).

[71]*Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).

— 15 —

requiring the ALJ to discuss them.[72]  Plaintiff expands her arguments in her reply briefing, arguing that her obesity should have been considered in its relationship to low intellectual functioning at Listing 12.05(C).

Plaintiff's arguments in this matter are also without merit.  Because obesity is not a listed impairment, the ALJ is not obligated to consider it at Step Three.  Obesity only needs to be considered as it relates to plaintiff's Residual Functional Capacity at Steps Four and Five, except in those circumstances when, either alone or in combination with other listing-level impairments, it is equivalent to a listing-level impairment.  This is a high standard, as listing-level impairments are designed to weed out the clear cases where a person is obviously disabled.  For this reason, obesity is *not* a listing-level impairment, and the impairments complained of only reach listing level when they are extremely severe.  Plaintiff's bald allegations that her joint dysfunction (Listing 1.02), spinal disorder (Listing 1.04), peripheral neuropathy (Listing 11.14) or diabetes mellitus with neuropathy (Listing 11.14), alone or in conjunction, reach this level of severity have no support in the record.  The ALJ stated that no physician opined that plaintiff's obesity met or equaled Listing-level criteria, which is all that is required without strong medical evidence to the contrary.[73]  The ALJ was thus not obligated to explicitly consider obesity in further detail at Step Three.

Plaintiff's argument that the ALJ should have considered Listing 12.05(C), mental retardation, is similarly not supported by the evidence.  A claimant should be found disabled when demonstrating "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a

---

[72]*Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir, 1990).

[73]Admin. Rec. at 20, *see* 390-91, 397.

physical or other mental impairment imposing an additional and significant work-related limitation of function,"[74] At Step Three, the ALJ considered plaintiff's affective disorder, but did not consider whether plaintiff was mentally retarded.  An agency regulatory clarification does not require a medical diagnosis of "mental retardation" in explicit terms for Listing 12.05(c) to be satisfied.[75]  This is because "[t]he four major professional organizations within the United States that deal with MR [mental retardation] have each established their own definition of MR."[76]  Thus, the agency's definition has, as a baseline, a required I.Q. score below 70, which is required by all professional definitions for mental retardation.  However, the agency requires that the IQ score be "valid" in order to trigger inquiry into Listing level impairment.  Because the lone IQ test with a performance of 70 cited by the plaintiff was said to be <u>invalid</u> by its examining doctor, who opined that the plaintiff's IQ was higher and likely to be in the mid-80s and low-average, the test is presumptively invalid.  Moreover, the explanatory material provided by the agency under 12.00, mental disorders, holds that the results of a standard intelligence test are only part of the overall assessment, and so the narrative report that accompanies the test results should comment on whether the I.Q. scores are themselves valid and consistent with the individual's developmental history and degree of functional limitation.[77]  Despite the fact that the Social Security Act is remedial and the agency has expressly singled out individuals with mild mental retardation for special treatment in determining entitlement to benefits, it would be

---

[74]Listing 12.05.

[75]67 Fed. Reg. 20018, WL 661740 (2002), *Technical Revisions to Medical Criteria for Determinations of Disability*.

[76]*Id.*

[77]20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(6)(a).

unreasonable to ask the ALJ to ferret out any potential claims that might be inferred from unreliable evidence.  In this instance, the ALJ did not act unreasonably by failing to investigate further evidence of a low I.Q. score.

### 3.  ALJ's Consideration of Medical Evidence and Lay Opinions

Plaintiff takes issue with the ALJ's RFC assessment made prior to reaching Step Four, arguing that the ALJ did not properly weigh medical source opinion evidence, plaintiff's own subjective testimony, and third-party reports.

#### A.  ALJ's Evaluation of Medical Source Opinion Evidence

Plaintiff claims that the ALJ failed to address the opinions of Dr. Hatfield and Dr. Hilts, treating physicians.  Plaintiff also objects to the weight the ALJ gave to the opinion of treating physician Dr. Wang as "inapposite," and examining physician Dr. Halloum because "an unidentified source (the changes are not initialed)" modified the findings.  Plaintiff also argues that the ALJ did not give substantial weight to the opinion of Dr. McPhee, despite claiming to do so in the decision.

Cases in this circuit distinguish among the opinions of treating physicians and examining physicians.[78]  As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.[79]  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and

---

[78] For purposes of this opinion, the term "physician" or "doctor" includes psychologists and other health professionals who do not have M.D.'s.  See 20 C.F.R. § 404.1527 (defining "medical opinions" as "statements from physicians and psychologists and other acceptable medical sources," and prescribing the respective weight to be given the opinions of treating sources and examining sources).

[79]*Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987).

convincing" reasons.[80]  "Clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions.[81]  Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.[82]

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician.[83]  As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.[84]  And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.[85]

At the outset, this court notes that the ALJ considered and discussed all of the following physicians' opinions with reasoned and considered analysis.  An ALJ is not required to discuss every line of every page in the administrative record, but only to address those limitations affecting a disability determination for which medical evidence exists.  Although plaintiff extensively challenges the ALJ's findings regarding carpel tunnel syndrome, this was never a central issue during the administrative process.  Evidence tending to show carpal tunnel

---

[80]*Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991).

[81]*Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988).

[82]*Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

[83] *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).

[84]*Pitzer*, 908 F.2d at 506.

[85]*Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

syndrome is extremely limited compared to the voluminous record, which primarily deals with diabetes and its correlated obesity, and depression.  Further, the ALJ noted several instances in which doctors noted the paucity of objective evidence supporting plaintiff's complaints of carpal tunnel syndrome-related pain.

   The ALJ did not explicitly address Dr. Hatfield's checked box indicating that plaintiff suffered from "moderately severe" restrictions in functioning.[86]  This opinion found impairments related to knee pain and asthma but did not specify any limitations in sitting, standing, walking, or lifting.  However, the ALJ incorporated Dr. Hatfield's limitations into his decision.  Dr. Hatfield found "mild restrictions" in activities involving unprotected heights, moving machinery, changes in temperature/humidity, driving, fumes, dust, and gases.[87]  The ALJ incorporated these limitations into his decision.[88]  Dr. Hatfield opined that plaintiff had "moderately severe" limitations in functioning, but did not describe the specific functional limitations.  A "moderately severe" limitation is defined as an impairment in functioning that may or may not lead to a finding of disability.  The ALJ accepted Dr. Hatfield's specifically indicated limitations, which accord with the larger bulk of the medical records indicating there is no disability.  If the ALJ had explicitly addressed this checked box in Dr. Hatfield's records, this would not have changed the outcome, even if rejected, because the limitation described merely indicates that plaintiff may or may not have been disabled.[89]  However, because the ALJ incorporated all of Dr.

---

[86]Admin. Rec. at 457-458.

[87]*Id*.

[88]Admin. Rec. at 21.

[89]*See Curry v. Sullivan,* 925 F.2d 1127, 1131 (9th Cir.1990) (applying the harmless error standard); *Booz v. Sec'y of Health and Human Serv.,* 734 F.2d 1378, 1380 (9th Cir.1984) (same).

Hatfield's diagnosed limitations in the RFC findings, the ALJ's opinion is in accord with Dr. Hatfield's opinion, and proper.[90]

Dr. Hilts, a treating physician, opined that plaintiff suffered severe, constant pain, causing impairment in ability to function.  The ALJ rejected this opinion as inconsistent with Hilts' own diagnostic examinations and clinical signs, citing a treatment note sending plaintiff home with the remark that "there is nothing wrong with the claimant."[91]  Plaintiff argues that medical records, X-rays, nerve conduction studies, and physical examinations show that the ALJ's statement that there was nothing wrong with the plaintiff is not supported by substantial evidence.[92]  Plaintiff's brief mistakenly attributes this statement to the ALJ and attempts to refute it; the ALJ actually cited the statement that "there is nothing wrong" with plaintiff in order to show inconsistency between Dr. Hilts' opinion and her own medical records.  The ALJ properly used the medical record and the plaintiff's argument misconstrues the decision.[93]  The ALJ rejected this part of the doctor's opinion because it was inconsistent with her own treatment records, not simply because it did not accord with the bulk of the other medical evidence.[94]  The ALJ accepted some parts of the doctor's opinion but not those that conflicted with her own

---

[90]*Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987).

[91]Admin. Rec. at 25, 671.

[92]Plaintiff's Brief at 27.

[93]Defendant does not defend the ALJ's explanation, and offers only the alternative defense that the opinion was "conclusory," a rationale upon which this court cannot uphold the decision.

[94]*Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

treatment records.  This reason is specific and legitimate.[95]  There is nothing objectionable about the ALJ's interpretation of Dr. Hilts' medical evidence.

The ALJ gave "substantial weight" to the opinion of treating physician Dr. Wang, but plaintiff says there is no "opinion" of Dr. Wang.  Plaintiff argues that treatment records of clinical impressions and diagnoses are not opinions, and thus, the ALJ could not have relied on it.  The ALJ's error in calling Dr. Wang's records an "opinion" did not prejudice plaintiff, and is harmless.[96]  Plaintiff also challenges the ALJ's decision as inapposite because it does not accept all of Dr. Wang's findings of hand and wrist impairments.  Dr. Wang's opinion of plaintiff's hand limitations is actually quite sparse: plaintiff reported a decline in hand functioning on January 11, 2008, and positive Tinel's sign indicated possible carpal tunnel syndrome.[97] The ALJ did not find that plaintiff was impaired by carpal tunnel, yet gave Dr. Wang's opinion substantial weight.[98]  Dr. Wang only reported "possible CTS [carpal tunnel syndrome]" based on plaintiff's subjective complaints.[99]  The ALJ made it clear that, although plaintiff continued to complain of carpal tunnel syndrome, objective medical examinations and doctor's opinions repeatedly refuted this claim.[100]  The ALJ noted several instances in which clinical examinations of

---

[95]*See e.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.1995).

[96]*See Curry v. Sullivan,* 925 F.2d 1127, 1131 (9th Cir.1990) (applying the harmless error standard); *Booz v. Sec'y of Health and Human Serv.,* 734 F.2d 1378, 1380 (9th Cir.1984) (same).

[97]Admin. Rec. at 468.

[98]Admin. Rec. at 25.

[99]Admin. Rec. at 467-468.

[100]Admin. Rec. at 24-25.

plaintiff's arms revealed normal results: an ultrasound taken in March 2004, and "physical evaluations showing normal muscle tone with no atrophy, rigidity, spasticity, fasciculation, swelling or tenderness in any joint, and 4 out of 5 muscle strength in the arms and legs."[101]  The ALJ's findings here are in accord with Dr. Wang's diagnosis.  Dr. Wang only reported possible carpal tunnel, based on subjective reports and weak objective findings.  The ALJ, looking at the record as a whole, agreed with this assessment, and found that plaintiff did not suffer severe limitations from carpal tunnel.  The ALJ's acceptance of Dr. Wang's opinion is supported by substantial evidence and comports with the record as a whole.[102]

The ALJ gave substantial weight to the opinion of consultative examiner Dr. Halloum. Plaintiff challenges Dr. Halloum's record as modified by "an unidentified source (the changes are not initialed)."[103]  Plaintiff submitted these treatment records as accurate statements to prove her disability, and then challenged them on appeal.  Defendant argues the ALJ "reasonably interpreted the corrections (which the doctor initialed in places) as Dr. Halloum's."[104]  The court must affirm the ALJ's reasonable interpretation of the evidence, it will not substitute its own judgment for that of the ALJ.[105]

The ALJ writes in the decision that he gave substantial weight to the opinion of examining physician Dr. McPhee, but plaintiff says this is not true.  The ALJ rejected Dr. McPhee's opinion

---

[101]*Id.*

[102]*See Batson*, 359 F.3d at 1196.

[103]Admin. Rec. at 444, Plaintiff's Br. at 28-29.

[104]*Citing Tommasetti*, 533 F.3d at 1038 (where the ALJ's interpretation of the evidence is rational, it should be affirmed).

[105]*Gallant v. Heckler,* 753 F.2d 1450, 1452-53 (9th Cir. 1984); *Batson*, 359 F.3d at 1196.

that plaintiff was limited to occasional handling and fingering.[106]  Dr. McPhee found that plaintiff could lift up to 50 pounds occasionally, 25 frequently; walk eight hours per work day; sit without limitation; occasionally climb, kneel, crouch, crawl; occasionally handle and finger without feeling limitations, and frequently stoop.[107]  The ALJ gave substantial weight to Drs. McPhee and Halloum, finding that plaintiff could lift and carry 10 pounds; sit for six hours and stand or walk for two hours per work day; occasionally climb, balance, stoop, kneel, crouch and crawl; and never climb ladders, rope, or scaffolds.[108]  Thus, the ALJ incorporated all of Dr. McPhee's limitations into his decision except for those incident to carpal tunnel syndrome.  The ALJ explained that diagnostic examinations showed normal bilateral extremities and described plaintiff's activities which were incongruous with severe pain.[109]  For these reasons the ALJ did not credit the opinion of Dr. Halloum on the single point of limitation to occasional fingering and handling.  This is a specific and legitimate reason for disbelieving the controverted opinion of an examining doctor, and in accord with the bulk of the medical evidence.[110]  The reviewing court may not substitute its own judgment for that of the ALJ.[111]

Based on the foregoing, the ALJ found that plaintiff had moderate limitations in the ability to sustain memory, concentration, and pace.  Plaintiff incorrectly states that the vocational expert

---

[106]Admin. Rec. at 386.

[107]Admin. Rec. at 386.

[108]Admin. Rec. at 21.

[109]Admin. Rec. at 23-25.

[110]*Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

[111]*Batson*, 359 F.3d at 1196.

testified that these limitations would preclude her from all work.[112]  Plaintiff's misapprehension of the record has been addressed above.

### B.  Subjective Complaints

Plaintiff argues that the ALJ's opinion is not supported by the medical evidence because it rejected some of plaintiff's own testimony of her subjective symptoms as inconsistent with activity reported elsewhere and because clinical signs did not support her activity level.  The ALJ also rejected a lay third-party report with minimal comment.  The ALJ gave several legitimate reasons for rejecting plaintiff's report, as well as her daughter's.

### I.  Plaintiff's Testimony

The ALJ noted that plaintiff's testimony, if it were credible, would support a finding of disabled.[113]  Plaintiff testified that she stopped working in September 2003 due to fatigue, side effects from medication, and leg pain.  She said that she did not help around the house or assist her son getting to school.  She said she used a walker or cane to ambulate, and drove two or three times per week.[114]  She testified that she could lift a gallon of milk, stand or walk up to thirty minutes at a time for a total of two to three hours per day, and sit for thirty minutes at a time for a total of two to three hours per day.[115]

---

[112]Pl. Br. at 29.

[113]Admin. Rec. at 22.

[114]Admin. Rec. at 36-37, 49-50.

[115]Admin. Rec. at 50-52.

When deciding whether to accept subjective symptom testimony from a claimant, the ALJ performs a two-step analysis.[116]  In the first step, the claimant must produce objective medical evidence of one or more impairments that could reasonably be expected to produce some degree of symptom.  In the second step, in the absence of malingering, the ALJ may only reject the claimant's subjective testimony as to the severity of the symptoms by making a specific finding stating clear and convincing reasons for the rejection, including what testimony is not credible and what facts in the administrative record lead to that conclusion.

Plaintiff submitted some medical evidence that she had impairments which could have produced her alleged symptoms, and there was no affirmative evidence of malingering, so the ALJ was required to provide "specific, clear and convincing reasons" to reject plaintiff's testimony.[117]  The ALJ found plaintiff "not entirely credible" because the medical record indicated that she reported to a consultative examiner that she sustained a higher level of activity, including running normal household chores and caring for herself, than she testified to.[118]  Plaintiff argues that these reasons are not clear and convincing because these activities are not comparable "to the grueling pace required of a work environment."[119]  The plaintiff incorrectly cites cases and regulations relating to ability to work, rather than cases that deal with credibility determinations.  It is true that grocery shopping and cleaning are not indicative of an

---

[116]*Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996).

[117]*Id.*

[118]Admin. Rec. at 22, citing Exhibits 1F, 2F, 3F, 8F, 12F, 28F, and 30F.

[119]Pl. Brief at 31, citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).

ability to engage in sustained work activity,[120] but the inconsistency between the limitations which plaintiff's testimony describes and her prior admitted limitations from the medical record are legally sufficient reasons to give less credit to plaintiff's testimony.  Another inconsistency recognized by the ALJ is that plaintiff testified that she could not work due to medication side effects, but told her treating physicians on several occasions that she was experiencing no side effects.[121]  Where the ALJ's credibility assessment is supported by substantial evidence, it will not be disturbed even where some of the reasons for discrediting a claimant's testimony are properly discounted.[122]  Because the ALJ properly identified multiple inconsistencies between plaintiff's testimony and subjective reports to doctors, the credibility finding will not be disturbed.

### II.  Third Party Report

Plaintiff's daughter (who is now a party in interest, due to plaintiff's passing) filed a third party report attesting that plaintiff needed assistance in completing activities of daily living.[123]  Plaintiff argues that the ALJ gave no reason for disregarding this report, and states the established law that an ALJ may not generally reject without comment lay testimony.[124]

---

[120]*Reddick*, 157 F.3d at 720.

[121]Defendant defends the ALJ's finding using several impermissible reasons.  While a failure to comply with a prescribed course of treatment may also adversely affect credibility, the ALJ did not rely on this rationale, and it cannot thus be used to uphold the decision.  Additionally, failure to lose weight is generally not a legitimate reason to discredit a plaintiff for failure to follow prescribed treatment.

[122]*Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir.2001).

[123]Admin. Rec. at 24.

[124]*Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996); *Ray v. Chater*, 934 F.Supp. 347, 350 (N.D. Cal. 1996).

Plaintiff's daughter reported that plaintiff did not perform housework or cook, but plaintiff told Dr. Huddleston that she performed normal household activities, such as cooking and cleaning.[125]  The standard for rejecting third party lay reports is not high, the ALJ must only identify specific, germane reasons for discounting the statements.[126]  That standard was met here.

Conclusion

Because the ALJ's decision contained no harmful legal error and was based on substantial evidence, IT IS HEREBY ORDERED that Plaintiff's Motion at Docket 20 is DENIED.  The final decision of the Commissioner of the Social Security Administration is affirmed.  Judgment shall be entered accordingly.

Dated this 14th day of April, 2011, at Anchorage, Alaska.

/s/ H. Russel Holland
United States District Judge

---

[125]Admin. Rec. at 25, *compare* Admin. Rec. at 134-35 *with* Admin. Rec. at 378.

[126]*See Carmickle*, 533 F.3d at 1163-64.

**Appendix A: Medical Evidence and Records**

A. Physical Impairments

   1.  Treating Physicians

   Dr. Helen Hilts was the primary care provider for plaintiff from June 2005 through March 2008. A September 28, 2005 MRI of the plaintiff's lumbar spine shows normal shape and vertebral bodies and unremarkable prevertebral parasagital tissues, with no abnormalities except for disc desiccation with slight flattening of the L3-4, L4-5, and L5-S1 vertebral areas.[127]

   On August 11, 2005 a nurse referred plaintiff to Dr. George Wang, a neurologist.[128] This was repeated on August 22, 2005.[129] An urgent request for authorization to perform an MRI was again requested by a nurse on August 26, 2005.[130] Dr. Hilts referred plaintiff to TMC Advanced Imaging on September 28, 2005.[131]

   On August 23, 2005 Dr. Mark Stern of the Tri-City Cardiology Consultants gave plaintiff a cardiac examination.[132]  The doctor noted several reported episodes of chest pain, combined with multiple risk factors, including diabetes, cigarette use, hyperlipidemia, and morbid obesity, and discussed "the absolute emphatic necessity" for plaintiff to stop smoking.[133]

---

[127]Admin. Rec. at 763-764.

[128]Admin. Rec. at 702.

[129]Admin. Rec. at 699.

[130]Admin. Rec. at 698.

[131]Admin. Rec. at 692.

[132]Admin. Rec. at 283-284.

[133]Admin. Rec. at 284.

Dr. George Wang examined plaintiff on August 23, 2005 for pain of hands and feet, which plaintiff described as tingling and cold sensations which gradually worsened over the prior three months.[134]  Dr. Wang examined plaintiff and recommended further study with wrist braces.[135]

On August 30, 2005 Dr. Wang evaluated plaintiff's lower extremities and the tests were consistent with mild lumbosacral radiculopathy and mild axonal polyneuropathy.[136]  An "essentially normal nerve conduction velocity study" was also performed.[137]

On October 3, 2005, Dr. Mark Stern "absolutely, emphatically" prescribed her to quit smoking, and noted that she "must lose a significant amount of weight."[138]

On October 10, 2005 Dr. George Wang, a neurologist, examined plaintiff for hand and foot pain, who assessed possible carpal tunnel syndrome and possible peripheral neuropathy and prescribed weight loss and prescriptions.[139]

After a sleep study showed sleep apnea, a request for a CPAP machine was made on March 8, 2006.[140]

---

[134]Admin. Rec. at 297.

[135]Admin. Rec. at 297-299.

[136]Admin. Rec. at 300-301.

[137]Admin. Rec. at 307.

[138]Admin. Rec. at 282.

[139]Admin. Rec. at 293-295.

[140]Admin. Rec. at 664.

Plaintiff returned for a refill on her Percocet prescription on April 17, 2006.[141] Further refills were made on May 23, 2006, September 20, 2006.[142]

Records show Vicodin and other pain relief prescriptions on December 27, 2005 for severe pain.[143] Vicodin was recorded as not working on December 30, 2005.[144] Refills were requested on January 5, 2006 [mistakenly transcribed as 2005] and granted on January 20, 2006.[145] Plaintiff requested a different pain prescription on February 7, 2006 because her generic pain medications made her sick.[146]

Dr. Angela Dagirmanjian, examining plaintiff's lumbar spine MRI on February 6, 2006 for Dr. Hilts, found slight scoliosis but an otherwise stable comparison with the prior scan.[147]

Dr. Hilts refilled plaintiff's Percocet prescription on April 26, 2006, and recommended further laboratory testing.[148]

Because the neurologist found no medical evidence explaining reported pain, plaintiff returned to Dr. Hilts on February 23, 2006, but was sent home, noted to have "nothing wrong."[149]

---

[141]Admin. Rec. at 660.

[142]Admin. Rec. at 651-654.

[143]Admin. Rec. at 683.

[144]Admin. Rec. at 678.

[145]Admin. Rec. at 677, 673.

[146]Admin. Rec. at 670.

[147]Admin. Rec. at 313-314, 351-352.

[148]Admin. Rec. at 718.

[149]Admin. Rec. at 671.

On July 5, 2006, plaintiff went to Dr. Hilts for chest pain, not wanting to wait for her appointment the next week.[150] She returned on July 26, 2006 for a lab work referral and refill on pain medications.[151] Plaintiff requested a hand-written prescription for Percocet on November 7 and November 13, 2006.[152] On November 22, 2006, plaintiff returned to Dr. Hilts for a refill on her pain medications.[153] A further refill was requested on January 2, 2007.[154] A refill for Percocet was written on February 26, 2007.[155]

On October 23, 2006, Dr. Stephen Hatfield evaluated plaintiff's complaint of bilateral knee pain.[156] Dr. Hatfield had seen plaintiff one year prior and prescribed Naprosyn, which plaintiff had ceased taking.[157] Plaintiff was injected with pain reducer and diagnosed with severe knee pain.[158] Dr. Hatfield found plaintiff's medical condition to be moderately severe overall, which seriously affected ability to function.[159]

---

[150]Admin. Rec. at 635.

[151]Admin. Rec. at 632.

[152]Admin. Rec. at 595-596.

[153]Admin. Rec. at 633.

[154]Admin. Rec. at 592.

[155]Admin. Rec. at 587.

[156]Admin. Rec. at 456-458.

[157]Admin. Rec. at 456.

[158]Admin. Rec. at 456-457.

[159]Admin. Rec. at 458.

Dr. Hilts authorized prescription refills on March 1, March 14, and March 26 2007.[160]  A glucose checking machine and prescription for pain medications were recorded on March 6, 2007, although a note questioned whether plaintiff needed a machine.[161]

A mammogram was requested "ASAP" on May 4, 2007.[162]  A secondary mammogram was requested on June 8, 2007.[163]

Plaintiff's Percocet was refilled April 18, 2007.[164]

On May 4, 2007 plaintiff reported being unable to control her glucose levels and chest pain.[165]

A progress report completed June 6, 2007 recorded no changes but extreme depression.[166]

Ibuprofen was prescribed on July 26, 2007.[167]

On August 17, 2007 Dr. Stephen Hatfield saw plaintiff for longstanding bilateral knee pain. Prior pain injections, occasional anti-inflammatory drugs, and a knee brace were reported to be ineffectual.[168] Previous MRIs showed nothing other than arthritis and new MRIs were not recommended, while X-rays showed degenerative joint disease.[169]

---

[160]Admin. Rec. at 572-574.

[161]Admin. Rec. at 582.

[162]Admin. Rec. at 570.

[163]Admin. Rec. at 569.

[164]Admin. Rec. at 568.

[165]Admin. Rec. at 557-558.

[166]Admin. Rec. at 551-555.

[167]Admin. Rec. at 548.

[168]Admin. Rec. at 460.

[169]*Id.*

An August 20, 2007 X-ray revealed minor degenerative changes in both knees.[170]

An endoscope was prescribed on October 5, 2007, along with a Percocet refill.[171] Prescriptions were refilled on November 26, 2007, and again on January 18 and February 21, 2008.[172]

On November 17, 2007 plaintiff saw Dr. George Wang of the Neurology and Sleep Medicine Associates on referral from Dr. Hilts.[173] She had been seen two years prior with carpal tunnel syndrome, and reported progressively worsening symptoms, which woke her at night and impaired daily functioning.[174] She also reported tingling and numbness of her lower extremities, and pain like "walking on glass."[175] Because plaintiff was already taking Naprosyn, Cymbalta, and Lyrica, no medication was prescribed.[176]

A physical medical assessment form completed by Dr. Wang on November 21, 2007 reported severe back pain, possible carpal tunnel syndrome, and asthma.[177]

---

[170]Admin. Rec. at 461-462.

[171]Admin. Rec. at 507.

[172]Admin. Rec. at 502-503, 495-496.

[173]Admin. Rec. at 469-472.

[174]Admin. Rec. at 469.

[175]Admin. Rec. at 469-470.

[176]Admin. Rec. at 470-471.

[177]Admin. Rec. at 469-472.

Dr. George Wang evaluated plaintiff on January 11, 2008.[178] A decline of hand function was reported, and positive Tinel's sign indicated possible carpal tunnel syndrome.[179] Additionally, excruciating leg pain and peripheral neuropathy of the lower extremities was noted.[180]

On January 29, 2008 plaintiff was tested for leg and back pain. Testing results were consistent with lumbosacral radiculopathy affecting L5 and S1 levels bilaterally, clinical correlation was recommended.[181]

Dr. Wang evaluated plaintiff on March 12, 2008 for complaints of pain in the hands and feet. Noted to be taking Neurontin and Tramadol, neither of which helped with plaintiff's extreme skin sensitivity that made walking feel like "trying to walk on glass."[182] Plaintiff described back pain as an 8 on a scale of 1 to 10, and also reported hand pain which made daily activity difficult.[183] Plaintiff was taking Novalog, Lantus, metformin and Percocet, but was not in acute distress and mentally sound, so physical therapy was planned.[184]

Dr. Hilts prescribed a walker for plaintiff's knees on November 1, 2008. Platintiff was 5'4" and weighed 280 pounds, but prognosis was good.[185]

2.  Examining Physicians

---

[178]Admin. Rec. at 466-468.

[179]Admin. Rec. at 468.

[180]*Id.*

[181]Admin. Rec. at 473-477.

[182]Admin. Rec. at 463.

[183]*Id.*

[184]Admin. Rec. at 464-465.

[185]Admin. Rec. at 686-688.

On December 8, 2003, plaintiff presented for droop on the right side of her face.[186]  Dr. Tiffany Brian diagnosed nerve palsy to last three or four weeks, and provided requested sleeping pills.[187]

Dr. Denise Belisle examined plaintiff, who suffered dysfunctional uterine bleeding on December 5, 2003.[188]  An examination was performed two days later on the 7th.[189]  On March 3, 2004, she was admitted to Chandler Regional Hospital for a total abdominal hysterectomy.[190] The surgery was successfully performed on March 4, and during recovery her abdomen was noted to be normal except for pneumonia.[191]  She was discharged after recovering well on March 14, 2004.[192]

Plaintiff presented to the emergency room on December 13, 2004 with back pain.[193]  She reported a fall and was diagnosed with low back strain and discharged with a prescription for Percocet.[194]

---

[186]Admin. Rec. at 231.

[187]Admin. Rec. at 231-232.

[188]Admin. Rec. at 235.

[189]Admin. Rec. at 239-240.

[190]Admin. Rec. at 247-249, 259.

[191]Admin. Rec. at 260-279.

[192]Admin. Rec. at 248-249.

[193]Admin. Rec. at 223.

[194]Admin. Rec. at 224.

Dr. Martin Lehaman examined plaintiff's spine and lumbar for pain but found minimal issues on December 15, 2004.[195]

A sleep study was performed on plaintiff on February 22, 2005, during which she performed moderate respiratory events and snoring were observed.[196]   A CPAP device was recommended.[197]

On June 2, 2005, Michele Shackelford examined plaintiff, who expressed knee pain and popping. No other mental or physical symptoms were apparent, and plaintiff was discharged with a prescription for Vicodin.[198]

A September 18, 2005 referral by Dr. Hilts to TMC Advanced Imaging was inconclusive.[199]

Lab work for plaintiff's diabetes was run on June 17, 2005, July 12, 2005, and September 2, 2005.[200] Further lab tests for plaintiff's diabetic condition and thyroid was performed on May 2, 2006, June 6 and 14 of 2006, August 1, 2006, October 12 and 17 of 2006, and November 14, 2006.[201] A negative thyroid scan was recorded on January 25, 2007.[202]

Dr. Michael O'Meara evaluated plaintiff for chest pain on September 9, 2005, and found no angina after an adenosine injection.[203]

---

[195]Admin. Rec. at 221.

[196]Admin. Rec. at 318.

[197]Admin. Rec. at 320-322.

[198]Admin. Rec. at 195-200.

[199]Admin. Rec. at 685.

[200]Admin. Rec. at 746-759.

[201]Admin. Rec. at 735-745.

[202]Admin. Rec. at 760.

[203]Admin. Rec. at 287-289.

Dr. Olga M. Kalinking examined an MRI of plaintiff's lumbar spine on September 28, 2005 and found some mild degenerative changes without other abnormal enhancement.[204]

Plaintiff presented at an emergency room at Chandler Regional Hospital for knee pain on June 30, 2006.[205]

Plaintiff presented at the emergency room on July 5, 2006 for chest pain. Plaintiff's weight was about 350 pounds, and Dr. Jason Daniels diagnosed a probable gastrointestinal issue and discharged her.[206]

On July 25, 2006, plaintiff was seen by Dr. Edward Urbank for Dr. Hilts for abdominal pain, whereupon liver enlargement with evidence of fatty infiltration was noted.[207]

Dr. William Lester, for Dr. Hilts, performed an X-ray of plaintiff's left knee on October 23, 2006, and noted mild osteoarthritic narrowing and a suprapatellar effusion.[208]

An Arizona DDS medical source statement of mental impairments dated August 29, 2006 diagnoses plaintiff with major depressive disorder, mild to moderate.[209]  Plaintiff was not significantly limited in remembering work procedures and simple instructions, and moderately limited in understanding detailed instructions.[210]  Plaintiff's work capacity in carrying out simple instructions, performing withing a schedule, sustaining an ordinary routine, working in

---

[204]Admin. Rec. at 315-316.

[205]Admin. Rec. at 201-207.

[206]Admin. Rec. at 210-214.

[207]Admin. Rec. at 762.

[208]Admin. Rec. at 761.

[209]Admin. Rec. at 371.

[210]Admin. Rec. at 370-371.

coordination with others, making simple decisions, and working at a consistent pace was not significantly limited; but she was moderately limited in her ability to concentrate for extended periods and carry out detailed instructions.[211]  Plaintiff was not significantly limited in any social interactions or make work-related adaptations.[212]  An intellectual quotient examination yielded results showing borderline intellectual functioning, but Dr. Huddleston questioned these results in his analysis and opined that plaintiff's Verbal IQ score of 81, indicating low-average functioning, was more likely an accurate reflection of plaintiff's true levels.[213]  For this reason, plaintiff, did not suffer from mental impairments other than mild/moderate depressive disorder, and her prognosis for returning to successful work was good.[214]

Dr. Neil McPhee examined plaintiff's complaints of carpal tunnel syndrome, leg pain, diabetes, sleep apnea, heart problems, and morbid obesity on August 30, 2006.[215]  She was found to be morbidly obese with provocative tests for carpal tunnel, leg pain, smokers' cough, poorly controlled diabetes, sleep apnea controlled by CPAP, and high cholesterol.[216]  Weight loss and improved diabetic control were highly recommended, and the doctor assessed the following limitations: lifting 50 pounds occasionally and 25 pounds frequently; walking six to eight hours per day; unlimited sitting, seeing, hearing, and speaking, reaching; occasional climbing,

---

[211]Admin. Rec. at 372-374.

[212]Admin. Rec. at 374-376.

[213]Admin. Rec. at 381.

[214]Admin. Rec. at 382.

[215]Admin. Rec. at 384-386.

[216]Admin. Rec. at 385-386.

kneeling, crouching, crawling and frequent stooping; occasional handling, avoiding machinery and heights, without limitations to extreme temperatures, chemicals, dust/fumes, or noise.[217]

A September 7, 2006 psychiatric review form completed by the Arizona DDS found insufficient evidence of a mental disability.[218]

A mental residual functional capacity assessment analyzing the time between May 15, 2005 and September 7, 2006 found plaintiff was only moderately limited in her ability to remember and understand detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods; there was no evidence of other impairment.[219]

A physical residual functional capacity assessment completed by Dr. Fahlberg on September 22, 2006 found plaintiff's impairments consistent with Dr. McPhee's August 30, 2006 assessment.[220]

Dr. Thompson examined plaintiff on January 23, 2007 for reported pain over the whole body, 24 hours per day.[221] Plaintiff was prescribed pain medication and found to be able to ambulate, dress, and bathe by herself.[222]

A neurology consultation with DDS examiner Dr. Halloum on March 27, 2007 showed mild distress from morbid obesity, diabetes, diabetic neuropathy, carpal tunnel, cholesterol, sleep

---

[217]Admin. Rec. at 386.

[218]Admin. Rec. at 389-414.

[219]Admin. Rec. at 415-418.

[220]Admin. Rec. at 419-425.

[221]Admin. Rec. at 583-585.

[222]Admin. Rec. at 585.

apnea, angina, and knee pain (a diagnosis for depression was entered but crossed out).[223] She was limited in standing due to diabetic neuropathy, her lifting was restricted to 15 pounds (50 had been crossed out), and had no limitations on sitting indicated.[224] A consultative finding of plaintiff's physical limitations dated May 13, 2007 by Dr. Jihad Halloum limited plaintiff to occasional climbing, stooping, kneeling, crouching, and crawling and no extreme temperature.[225]

Dr. David Young performed a psychological evaluation on plaintiff at the request of Arizona DDS on April 29, 2007.[226] Plaintiff scored 27 out of 30 on the Mini Mental Status exam, was oriented x3, had good immediate memory but had marked difficulty recalling words after delay, had difficulty counting backwards by 7 but spelled "world" backwards correctly, and had intact language skills but difficulty repeating a phrase.[227] She reported difficulty concentrating and frustration. Insight and judgment were considered to be fair. Plaintiff reported waking early to prepare her son for school, watching TV or going to appointments, visiting her son, and going to sleep between 1 and 3 a.m.[228] Plaintiff received visits from friends, shopped for groceries, and did not drive.[229]

---

[223]Admin. Rec. at 441-442.

[224]Admin. Rec. at 443-444.

[225]Admin. Rec. at 442-445.

[226]Admin. Rec. at 426-430.

[227]Admin. Rec. at 428.

[228]Admin. Rec. at 430.

[229]*Id.*

A physical residual functional capacity assessment and medical analysis completed by Dr. Ronald Nathan dated May 17, 2007 diagnosed plaintiff with DM (diabetes), obesity, peripheral neuropathy and sleep apnea.[230]  The doctor assessed plaintiff with the following capacity limitations: occasionally lifting/carrying 20 pounds, frequently 10 pounds; stand/walk at least 2 hours in an 8 hour workday, sit for a total of 6 hours in an 8 hour work day.  The doctor indicated that plaintiff's reported limitations were "partially credible at best," and that these limitations indicated the doctor's own medical opinion as to the medically determinable limitations.[231]  Postural limitations included occasional limitations on climbing ramps/stairs, stooping, kneeling, crouching and crawling; and environmental limitations included avoiding concentrated exposure to extreme cold, heat, vibrations, fumes, and gasses.[232]

Plaintiff was treated in urgent care for an infection on September 19, 2007.[233]

A November 30, 2007 evaluation of the plaintiff's arms showed mild demyelinating mononeuropathy (impaired sensation caused by diabetes)[234] on the left arm, with no evidence of bilateral carpal tunnel syndrome.[235]

Glucose screenings were performed on January 23, 2007, March 19, 2007, May 4, 2007, June 6, 2007, August 8, 2007, August 22, 2007, September 19, 2007, October 26, 2007, December 19,

---

[230]Admin. Rec. at 446-454.

[231]Admin. Rec. at 447.

[232]Admin. Rec. at 448-450.

[233]Admin. Rec. at 512-521.

[234]*Dorland's Medical Dictionary* (28th Ed.).

[235]Admin. Rec. at 478.

2007, March 19, 2008, March 26, 2008, and April 17, 2008.[236] Further laboratory tests were

performed on November 20, 2007.[237]

### 3. Additional Medical Records

All of the following medical evidence in the Administrative Record *was not* before the ALJ at

the time of the decision.  It was submitted to the Appeals Council in a request for review.  The

review was denied, and plaintiff does not challenge this ruling on appeal.  Thus, the following

evidence is only important if it would significantly alter the decision and plaintiff can offer a

reason for not including it in the prior appeal (no such reason has been offered).[238]

A behavioral health and medical history form completed by Harry Battran on August 6, 2008

identified treatment to that date. Plaintiff was prescribed Lyric, Foreman, Gabapin, Zlopin,

Prozac, and Insulin, for her legs, diabetes, and depression.[239] Plaintiff reported suffering from the

following ailments all the time: severe dry mouth, cough, shortness of breath, swelling in legs,

ankles, feet, diarrhea/constipation, abdominal pain, joint and back pain, headaches, inappropriate

bowel elimination, and unusual sweats or chills..[240] She also reported getting less sleep, gaining

weight, and sometimes experiencing sore throat, dizziness, and nausea/vomiting.[241] She reported

---

[236]Admin. Rec. at 725-734, 720-723.

[237]Admin. Rec. at 725-726.

[238]*See Booz v. Secretary of Health & Human Servs.*, 734 F.2d 1378, 1380 (9th Cir. 1984); *see also* 42 U.S.C. § 405(g).

[239]Admin. Rec. at 767-787.

[240]Admin. Rec. at 770-771.

[241]*Id.*

smoking one pack per day, and said that Prozac helped the most with depression.[242] She reported hiding her symptoms of depression and anxiety since 1984.[243] Due to her anger and agitation, plaintiff was given a good prognosis provided she took medications as prescribed and engaged in anger management group therapy.[244] She described working until 2003 when her medical issues caused her to resign, although said that many had started in 1994. She was proud of her work history and reported not being able to comprehend instructions, and reported not being able to work at that time.[245]

A neurological evaluation of plaintiff's hands and feet was done at the request of Dr. Hilts on December 11, 2008.[246] She reported hospitalization in September of 2008 for disorientation and slurring of words, but without any clinically determined medical causes or recurrence of symptoms.[247] She presented good mental status, and her neurological examination was unchanged; Dr. George Wang planned to obtain hospital records for further study.[248]

On November 5, 2008, Dr. George Wang examined plaintiff at the request of Dr. Hilts for complaints of pain on hands and feet.[249] She reported that Neurontin and Lyrica assisted with

---

[242]Admin. Rec. at 771.

[243]Admin. Rec. at 772.

[244]Admin. Rec. at 779.

[245]Admin. Rec. at 786.

[246]Admin. Rec. at 788-789.

[247]Admin. Rec. at 788.

[248]Admin. Rec. at 789.

[249]Admin. Rec. at 791-793.

pain relief, including that she "ran out" of Lyrica and noticed worsened pain; she also reported hospitalization for a stroke but no stroke was recorded in the medical history.[250] Test results showed mild lumbrosacral radiculopathy on the L5 and S1 levels and no evidence of carpal tunnel syndrome.[251]

An August 27, 2008 consultation by Dr. Wang at the request of Dr. Hilts assessed bilateral carpal tunnel syndrome, headaches, back issues, and possible risk of stroke, and prescribed Lyrica and Neurontin.[252]

On July 8, 2008, Dr. George Wang examined plaintiff at the request of Dr. Hilts for complaints of hand and foot pain. A prescription of Lyrica was started, along with Neurontin and Percocet, as well as physical therapy.[253] Plaintiff reported being unable to hold anything or write, as well as having increasing difficulty walking.[254] Plaintiff reported uncontrolled pain at the maximum dosage of Neurontin, and was explained the importance of controlling her diabetes.[255]

A psychological evaluation by Dr. Wayne General, dated October 30, 2008 was performed for the Arizona Department of Economic Security and Disability Determination Service Administration.[256] Plaintiff reported a shortened attention span, difficulty writing from carpal

---

[250]Admin. Rec. at 791.

[251]Admin. Rec. at 792-793.

[252]Admin. Rec. at 794-796.

[253]Admin. Rec. at 797.

[254]*Id.*

[255]Admin. Rec. at 798-799.

[256]Admin. Rec. at 802-807.

tunnel syndrome and neuropathy from diabetes, leg pain, fear of others, and depression.[257] She reported low self-esteem and lack of motivation to leave her room, and performing few or no domestic chores.[258] She reported spending her free time watching television and sleeping.[259] On her questionnaire, plaintiff reported sleeping problems, low energy, mood swings, crying, inability to concentrate, headaches, dizziness, palpitations, feeling tense and panicky, depression, suicidal ideals, inability to relax or have a good time, feeling lonely, inability to make decisions, keep a job, and visual problems and voices.[260] A review of her MRIs showed no brain abnormalities.[261] Examinations revealed cooperation, 3x orientation, good abstracting ability and judgment, intact short- and long-term memory.[262] Concentration was beneath normal limits.[263] Plaintiff denied suicidal idealization within the prior two years, but claimed symptoms of dissociative identity disorder, and her IQ was estimated to be average or low average.[264] Dr. General ultimately diagnosed dysthymic disorder, panic disorder with agoraphobia, breathing-related sleep disorder, victim of abuse as a child, self-reported reading disorder, self-reported and observed mathematics disorder, self-reported disorder of written expression; as well as carpal

---

[257]Admin. Rec. at 802.

[258]Admin. Rec. at 802-804.

[259]Admin. Rec. at 804.

[260]*Id.*

[261]Admin. Rec. at 805.

[262]Admin. Rec. at 805-806.

[263]Admin. Rec. at 806.

[264]*Id.*

tunnel syndrome, diabetes, neuropathy in legs and arm, asthma, arthritis in knees, walking, climbing, and writing problems, and obesity.[265] She was opined to be capable of managing her own payments, but her prognosis for returning to work was poor, as her ability to perform work-related tasks was estimated below-average in attention span, concentration, and short-term memory.[266] She had not worked since 2003, when she resigned from work for menstrual irregularities which are unlikely to recur. She had adequate interpersonal skills.[267]

### 4.  Function Reports

Plaintiff's self-reported medical history, completed on June 29, 2005, denied asthma or arthritis, and admitted depression and diabetes.[268]

Plaintiff completed a self-reported functionality report dated July 17, 2006.[269]  She reported needing assistance to get out of bed and reach for her walker in the morning.[270]  Her daughter cooked breakfast and helped her son get to school.[271]  She reported that her disability prevented her from working and normal function and affected her sleep patterns.[272]  Plaintiff could no

---

[265]Admin. Rec. at 807.

[266]*Id.*

[267]*Id.*

[268]Admin. Rec. at 715.

[269]Admin. Rec. at 123-132.

[270]Admin. Rec. at 123.

[271]Admin. Rec. at 123-124.

[272]Admin. Rec. at 124.

longer cook, do chores, yardwork, go out alone, or drive (side effect from medications).[273] Plaintiff reported that she could not hold a job due to medications and constant pain.[274]  She would watch television daily and talk with her family, although medication made her irritable and agitated, and pain minimized her social life.[275]  Plaintiff reported that her limitations affected almost all job skills and made her depressed and unable to function.[276]  She attributed her leg pain to a secondary infection after her hysterectomy, which is when she left her previous job.[277]

   Destini Scadden, plaintiff's daughter, completed a third party function report on July 18, 2006.[278]  She described needing take care of her brother for plaintiff.[279]  Plaintiff's daily activities were taking medication, eating breakfast, attending doctor appointments, and watching television; her disability interfered with everyday tasks and work.[280]  Plaintiff needed assistance dressing and grooming, and could not cook or do chores.[281]  Plaintiff watches television or movies every day, but needed to adjust her legs and reposition every hour; talked with family, attended doctor's appointments, and would get frustrated easily.[282]  Pain affected her ability to

---

[273]Admin. Rec. at 125-126.

[274]Admin. Rec. at 126.

[275]Admin. Rec. at 127-128.

[276]Admin. Rec. at 128-129.

[277]Admin. Rec. at 130.

[278]Admin. Rec. at 133-140.

[279]Admin. Rec. at 134.

[280]Admin. Rec. at 133-134.

[281]Admin. Rec. at 134-136.

[282]Admin. Rec. at 137-139.

pay attention, but she could understand everything sometimes and get along "just fine" with authority figures.[283]

---

[283]Admin. Rec. at 138-139.